## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| FEDERAL TRADE COMMISSION and STATE OF MISSOURI, ex rel. Attorney General Eric Schmitt, <br><br>Plaintiffs, <br><br>v. <br><br>DISABLED POLICE AND SHERIFFS FOUNDATION, INC., a corporation also doing business as THE AMERICAN POLICE AND SHERIFFS ASSOCIATION and POLICE OFFICERS SAFETY ASSOCIATION, and DAVID KENIK, individually and in his capacity as an officer or director of Disabled Police and Sheriffs Foundation, Inc., <br><br>Defendants. | Case No: <br><br>**COMPLAINT FOR PERMANENT INJUNCTION AND OTHER EQUITABLE RELIEF** |

Plaintiffs, the Federal Trade Commission and the State of Missouri at the relation of Attorney General Eric Schmitt ("Plaintiffs"), for their Complaint against Defendants Disabled Police and Sheriffs Foundation, Inc. ("DPSF"), also doing business as the American Police and Sheriffs Association and Police Officers Safety Association, and David Kenik (collectively "Defendants"), allege:

## SUMMARY OF THE CASE

1.      Sham charity DPSF collected more than $9.9 million in donations through telemarketing and direct mail nationwide from 2013 and through 2017. DPSF has promised donors that their contributions will be used to provide financial assistance to the

families of police officers killed in the line of duty, financial support to disabled police officers, life-saving equipment to law enforcement agencies, and advanced, specialized training for law enforcement officers and departments. Those claims were false. The overwhelming majority of this money – such as almost 95% in 2015 – was spent paying Defendant Kenik and the professional fundraisers DPSF hired, not on the charitable programs DPSF described to its donors.

2.     For its eponymous program, helping disabled law enforcement officers, DPSF routinely spent less than one penny of each dollar donated – just 0.65 cents in 2015. That money went to five individuals. DPSF spending on grants to the families of slain officers, equipment to law enforcement departments, and specialized training for officers was no better. Overall, between 2013 and 2016 (the last year for which spending records are available), DPSF reported using just 5.41% of donations on *any* charitable program. Defendants lied to tens of thousands of donors about the good their charitable contributions would accomplish and prevented millions of dollars from helping law enforcement and their families. Defendants' deceptive conduct has violated Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45(a), Section 310.3(b) of the Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310.3(b), and Section 407.020 of the Missouri Merchandising Practices Act.

3.     The FTC brings this action under Sections 13(b) and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, and Section 6 of the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6105, to obtain temporary, preliminary, and permanent injunctive relief, rescission or reformation of contracts,

restitution, the refund of monies paid, disgorgement of ill-gotten monies, and other equitable relief for Defendants' violations of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), and Section 310.3(b) of the TSR, 16 C.F.R. Part 310.3(b).

4.      The State of Missouri at the relation of Missouri Attorney General Eric Schmitt, brings this action pursuant to 15 U.S.C. § 6103(a) of the Telemarketing Act, which authorizes state attorneys general to initiate federal district court proceedings to enjoin violations of, and enforce compliance with, the TSR, and to obtain damages, restitution, or other compensation, and to obtain such further and other relief as the court may deem appropriate. The Attorney General also brings this Complaint under the Missouri Merchandising Practices Act ("MMPA") §§ 407.020, *et seq.*, RSMo., for restitution, injunctive relief, disgorgement of ill-gotten monies, and other relief as set forth in the MMPA.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over the federal law claims pursuant to 28 U.S.C. §§ 1331, 1337(a), and 1345, and 15 U.S.C. §§ 45(a), 53(b), 6102(c), 6103(a), and 6105(b). This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

6.      Venue is proper in this District under 15 U.S.C. §§ 53(b) and 6103(e), and 28 U.S.C. §§ 1391(b)(1), (b)(2), (c)(1) (c)(2), and (d).

7.      Divisional venue is proper under E.D. Mo L.R. 3-2.07(B) because many of the events alleged herein occurred in counties that compromise the Eastern Division. Defendants received at least 1,086 donations from consumers in Missouri through

telephone solicitations calls made by Outreach Calling and Charitable Resource Foundation, of which at least 46%, about 500, resided in the counties compromising the Eastern Division.

## COMMERCE

8.     At all times material to this complaint, Defendants have maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PARTIES

9.     Plaintiff FTC is an independent agency of the United States Government created by statute. 15 U.S.C. §§ 41-58. The FTC enforces Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), which prohibits unfair or deceptive acts or practices in or affecting commerce. The FTC also enforces the Telemarketing Act, 15 U.S.C. §§ 6101-6108. Pursuant to the Telemarketing Act, the FTC promulgated and enforces the TSR, 16 C.F.R. Part 310, which prohibits deceptive and abusive telemarketing acts or practices. The FTC is authorized to initiate federal district court proceedings, by its own attorneys, to enjoin violations of the FTC Act and the TSR and to secure such equitable relief as may be appropriate in each case, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies. 15 U.S.C. §§ 53(b), 56(a)(2)(A), 56(a)(2)(B), 57b, 6102(c), and 6105(b).

10.     Attorney General Eric Schmitt is the Attorney General of the State of Missouri and brings this action pursuant to authority found in the Telemarketing Act, 15 U.S.C. § 6103(a) and the TSR, 16 C.F.R. § 310.7(a). Under 15 U.S.C. § 6103(a), state

attorneys general are authorized to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution, and other compensation on behalf of the state's residents.

11.     Attorney General Schmitt also brings this action in his official capacity pursuant to Chapter 407, RSMo.

12.     Defendant Disabled Police and Sheriffs Foundation, Inc., also doing business as the American Police and Sheriffs Association and Police Officers Safety Association, is currently located in Ste. Genevieve, Missouri. DPSF is incorporated as a nonprofit corporation in Rhode Island and is recognized as tax-exempt by the IRS under Section 501(c)(3) of the Internal Revenue Code. Notwithstanding this, DPSF is organized and operated to carry on business for its own profit or that of its members within the meaning of Section 4 of the FTC Act. Acting alone or in concert with others, directly or indirectly, by telemarketing and other means, DPSF has made misrepresentations to donors nationwide regarding its purported charitable programs. DPSF transacts or has transacted business in this District and throughout the United States.

13.     Defendant David Kenik is the Executive Director and sole employee of Defendant DPSF. At all times material to this Complaint, acting alone or in concert with others, he has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of DPSF. Among other things, he manages the fundraising activities of the organization, including negotiating and signing contracts with for-profit fundraisers that authorize payment of as much as 90% of each donation to the fundraisers. He also approves the deceptive telemarketing scripts, pledge letters, and

other solicitation materials those fundraisers use to solicit donations on behalf of DPSF.

Kenik is solely responsible for the charitable programs of DPSF. Kenik was one of the

initial incorporators of DPSF and was previously chairman of its board of directors. Jill

Kenik, his wife, now serves as chairman of the board of directors. Kenik operates DPSF

from his home in Ste. Genevieve, Missouri. Kenik, in connection with the matters alleged

herein, transacts or has transacted business in this District and throughout the United

States.

### DEFENDANTS' BUSINESS ACTIVITIES

14.     DPSF's sole source of revenue is donations from the public. Since 2011, it

has contracted with two fundraisers to solicit donations on its behalf, primarily through

telemarketing: Outreach Calling and Charitable Resource Foundation. Contracts with

these fundraisers authorize nationwide solicitations. For every dollar collected by

Outreach Calling, DPSF pays Outreach 90 cents. DPSF pays Charitable Resource

Foundation 88 cents of every dollar it solicits. Other than signing the contract and

authorizing the solicitation materials used on its behalf – telemarketing scripts, pledge

cards, thank you letters and the like – DPSF engages in no oversight of the actions of its

fundraisers.

15.     DPSF solicitation materials have represented to donors that contributions

will fund four programs: 1) providing financial assistance to law enforcement officers

disabled in the line of duty, 2) providing financial assistance to the families of officers

killed in the line of duty, 3) providing law enforcement departments grants to purchase

safety equipment, and 4) providing advanced training programs for law enforcement departments and officers. Underlying these four representations is the foundational claim that donations will go to a legitimate charity. Each of these claims is deceptive. Year in and year out DPSF has spent donors' contributions not on the programs described to donors but rather on paying for fundraising, management and other administrative costs.



### *DPSF Deceptively Claims to Operate a Program that Financially Assists Disabled Officers*

16.     DPSF touts assisting disabled law enforcement officers as one of its key programs. The central importance of this program is highlighted in its very name, "Disabled Police and Sheriffs Foundation," which suggests – falsely – it is a "foundation" and – also falsely – that its purpose is to support disabled police and sheriffs.

17.     Telemarketing scripts approved by Kenik and used by DPSF fundraisers when soliciting donations from consumers have stated, among other things:

    a.   DPSF "provide[s] assistance to disabled officers";

    b.   "The programs support injured officers …"; and

    c.   "The Foundation … assist[s] officers that have been injured, disabled, or paralyzed."

See Attachment A (representative DPSF scripts).

18.    Claims about DPSF's programs helping disabled officers are repeated in the mailers sent to donors who have agreed to contribute. Extra white space and bold type further emphasize this program. Statements include:

    a.   "Some of the programs that we offer FREE of charge to all law enforcement officers include: … **Assistance to disabled officers.** (Injuries can be both physically and mentally devastating and these officers need our help.)." [Emphasis in original.]; and

    b.   "With your help the officers will enjoy the security of these programs. …. **"Disabled Officer Grants -** About 150 Law Enforcement Officers are assaulted and 10 are shot at every day. These grants help provide some relief for the officers injured in the line of duty and their families." [Emphasis in original.]

See Attachment B (representative DPSF mailers).

19.    DPSF uses images in its pledge mailers and on its website of men with prosthetic legs running or working out, or in wheelchairs to further reinforce its claims that it operates bona fide programs that provide assistance to disabled officers.

20.    In fact, DPSF is not a "foundation" for disabled police and sheriffs, and it is not devoted to that cause. Even the images of disabled men on its website were stock

photos or otherwise copied from elsewhere on the Internet, and did not depict individuals assisted by DPSF or represent actual DPSF programs.

21.     DPSF spends almost none of donors' contributions helping disabled officers. In the four years 2013 through 2016, it spent a total of $62,500 on grants to 27 disabled officers. That represents 0.83% of each dollar donated. In 2015, when donors contributed more than $1.5 million, DPSF spent just $10,000 on grants to 5 individuals. The "program" chiefly consisted of Kenik sending each individual a check. DPSF only publicizes the availability of these grants on its website. Contributions do not offer "security" to officers assaulted or shot in the line of duty, but rather are used to pay Kenik and the fundraisers he hired.

22.     Under these circumstances, DPSF made false or misleading claims about the nature and extent of its provision of assistance to disabled law enforcement officers. It did not operate a legitimate charitable program dedicated to assisting disabled law enforcement officers nationwide, and claims that it did so are deceptive.

### DPSF Deceptively Claims to Operate a Program that Assists Families of Slain Officers

23.     DPSF prominently claims that donations to it will support the families of officers slain in the line of duty. Images on its pledge mailers and website of a flag-draped coffin carried by uniformed pallbearers reinforce that claim.

24.     Telemarketing scripts approved by Kenik and used by DPSF's fundraisers to solicit donations from consumers in the name of both DPSF and its dba American Police and Sheriffs Association, have stated:

     a.     "Every day, brave men and women protect our streets, and I'm sure you've seen the news recently that officer fatalities have dramatically increased nationwide. The programs support injured officers and those KILLED in the line of duty with survivor assistance …";

     b.     "This drive also helps assist families of officers killed in the line of duty."; and

     c.     "The goal is to … help provide assistance to families of police officers killed in the line of duty."

See Attachment A (representative DPSF scripts).

25.     Similar claims are repeated in the mailers sent to donors who have agreed to contribute. As with the claim to assist disabled officers, extra white space and bold type further call attention to these program claims. Background facts about the number of officers killed annually reinforce the impression that this is an important program Statements include:

     a.     "With your help the officers will enjoy the security of these programs: … **Survivor's Assistance** for the families of officers **killed in the line of duty.** Your support helps DPSF provide financial aid to help the daughters, sons and spouses of fallen officers." [emphasis in original];

     b.     "We also **provide . . . relief** to families of **officers killed in the line of duty**. … Every day officers bravely go out to protect our streets knowing an **officer is killed in the line of duty** every other day in our country. **They are truly real life heroes."** [emphasis in original]; and

c. "Some of the programs that we offer FREE of charge to all law enforcement officers include: … **Assistance to the families of officers killed in the line of duty. (The loss of an officer and family** member is always a **tragedy** for both community and family.)" [emphasis in original].

See Attachment B (representative DPSF mailers).

26.     In fact, DPSF spends almost none of donors' contributions assisting the families of slain officers. In the four years 2013 through 2016, it spent a total of $60,000 on financial assistance to 25 families of slain officers. That represents 0.80% of each dollar donated. In 2015, when donors contributed more than $1.5 million to DPSF, just 3 families received a total of $6,000. The "program" consisted chiefly of Kenik writing checks to families he selected from a list of slain officers on a third party's website. The "goal" of the fundraising campaign was not to provide "relief" to the families of officers killed in the line of duty, but rather to pay Kenik and the fundraisers he hired.

27.     Under these circumstances, DPSF made false or misleading claims about the nature and extent of its assistance to the families of slain police officers. It did not operate a legitimate charitable program whose purpose was to provide assistance to the families of police officers killed in the line of duty, and claims that it did so are deceptive.

### DPSF Deceptively Claims to Operate a Program that Provides Equipment Donations to Police Departments

28.     In solicitations made by fundraisers seeking donations using the dba American Police and Sheriffs Association, DPSF has represented to donors that

contributions will allow DPSF to provide grants to police departments for the purchase of life-saving equipment. Statements made to donors have included:

  a. "The American Police and Sheriffs Association is having their fundraiser. The goal is to make advanced training available for police officers; provide life-saving equipment to under-funded departments, as well as help provide assistance to families of police officers killed in the line of duty."; and

  b. "Some of the programs that we offer FREE of charge to officers include: …**Life-saving equipment donations.** (With ever-tightening budgets, many law enforcement agencies are underfunded and lack the ability to provide their officers with **critical life-saving equipment.**" [emphasis in original];

See Attachment B (representative DPSF mailers).

29. DPSF spends almost none of donors' contributions providing any kind of equipment to law enforcement agencies. The only place it advertises the availability of such grants is on its website. In the four years 2013 through 2016, it spent a total of $47,677 on grants to law enforcement agencies. That represents 0.63% of each dollar donated. In 2015, when donors contributed more than $1.5 million, DPSF reported spending just $7,251 to provide equipment to 3 law enforcement departments. The "goal" of the fundraising campaign was not to supply life-saving equipment to under-funded departments but rather to pay Kenik and the fundraisers he hired.

30. Under these circumstances, DPSF made false or misleading claims about the nature and extent of its provision of equipment to law enforcement agencies. It did

not operate a legitimate charitable program whose purpose was to provide equipment to law enforcement agencies, and claims that it did so are deceptive.

### DPSF Deceptively Claims to Operate a Program that Provides Police with Advanced Training

31.     DPSF also represents to donors that contributions will support "advanced" and "life-saving" training programs for police departments and officers.

32.     Telemarketing scripts approved by Kenik and used by DPSF fundraisers when soliciting donations from consumers in the name of both DPSF and its dba American Police and Sheriffs Association, have stated:

a.     "The programs support . . . one of the nation's most advanced safety training programs.";

b.     "[DPSF] … was formed to provide assistance to law enforcement officers nationwide by providing life-saving training . . . .";

c.     "The goal of the Association is to help prevent officer injuries and deaths by increasing officer safety and effectiveness through free and low-cost training."; and

d.     "The Foundation provides specialized training for police officers to reduce on-the-job injuries and deaths. . .".

See Attachment A (representative DPSF scripts).

33.     These claims are echoed and amplified in the mailers sent to donors who have agreed to contribute, including:

a.      "With your help the officers will enjoy the security of these programs: Access to one of the nation's most ADVANCED safety training programs. . ." [capitalization in original];

b.      "Our primary goal is to prevent officer injury and death by increasing law enforcement officer safety and effectiveness through advanced training.";

c.      "Our primary goal is to increase the safety and effectiveness of our law enforcement officers through advanced training.";

d.      "Some of the programs that we offer FREE of charge to all law enforcement officers include: Training programs for departments and officers. Better training saves lives! (We produce our own law enforcement –specific training programs on critical issues and distribute them free to law enforcement officers nationwide.)"; and

e.      "Our Mission [is] to reduce the numbers of law enforcement officers injured and killed in the line of duty through training and education and support those who risk their lives every day for the safety of our community.".

See Attachment B (representative DPSF mailers).

34.      DPSF spends an insignificant amount of donors' contributions providing any kind of training to law enforcement agencies. In the four years 2013 through 2016, it reported spending 3.15% of contributions on its training "program."

35.      DPSF's "advanced" training program mostly consists of Kenik filming and producing videos that are then posted on the Internet. (DPSF has also occasionally

sponsored in-person trainings at conferences.) DPSF does not tell donors that its "advanced safety training programs" are videos. The videos are filmed at Kenik's home in Ste. Genevieve, Missouri. Kenik himself is not a law enforcement expert; his only law enforcement experience was as a reserve police officer in Lake Arthur, New Mexico. There he served as a firearms instructor and provided use of force training. The videos cover topics selected by Kenik and feature law enforcement trainers identified by Kenik.

36.     DPSF posts the videos to the website of a third party, www.policeone.com. DPSF provides links to the videos on its website and once, in 2016, it sent an unsolicited fax to some law enforcement agencies promoting the videos. Otherwise DPSF makes no effort to advertise the availability of its videos, even though DPSF tells donors it distributes its programs to law enforcement officers nationwide.

37.     In 2015, when donors contributed more than $1.5 million to DPSF, it produced 4 videos and sponsored one in-person training attended by 58 people. DPSF reported spending $62,588 on this training "program," which constituted 4.06 % of donors' contributions.

38.     Under these circumstances, DPSF made false or misleading claims about the nature and extent of its training activities. It did not operate a legitimate charitable program that provided advanced safety training to police officers, and claims that it did so are deceptive.

***DPSF Deceptively Claims that Donations Go to a Legitimate Charity***

39.     Central to the success of DPSF's fundraising is the overarching claim, direct or implied, that contributed funds would support a legitimate charity whose primary purpose is charitable. These claims are included in all DPSF solicitation materials.

40.     For example, telemarketing scripts used by DPSF fundraisers and approved by Kenik include the following:

a.     Telemarketers are directed to answer the frequently asked question "WHAT IS THE DISABLED POLICE AND SHERIFFS FOUNDATION?" [capitalization in original] with the answer:

"THE DISABLED POLICE AND SHERIFFS FOUNDATION IS A NON-PROFIT CHARITABLE CORPORATIN [sic],THAT WAS FORMED TO PROVIDE ASSISTANCE TO LAW ENFORCEMENT OFFICERS NATIONWIDE BY PROVIDING LIFE-SAVING TRAINING, FINANCIAL ASSISTANCE FOR THE INJURED AND SURVIVOR ASSISTANCE FOR THE FAMILIES OF OFFICERS KILLED IN THE LINE OF DUTY" [capitalization in original]; and

b.     In response to "DOES THIS HELP LOCALLY?" telemarketers are directed to say:

"THE MONEY RAISED DOES NOT GO TO ANY SPECIFIC POLICE DEPARTMENT. THE DISABLED POLICE AND SHERIFFS FOUNDATION IS A NATIONAL ORGANIZATION AND HELPS ALL

LAW ENFORCEMENT OFFICERS NATIONWIDE." [capitalization in original].

See Attachment A (representative DPSF scripts).

41.     Thank you letters to donors further the claim, stating:

a.     "The **Disabled Police and Sheriffs Foundation** is an independent nationwide non-profit organization that receives no government funds" and that "With your help we are able to **support thousands of officers** nationwide." [emphasis in the original];

b.     "You are supporting an organization that is working toward a safer life for you and your family"; and

c.     "Our goals are to help protect police and law enforcement officers nationwide and to make your community and neighborhood a safer place to live.".

See Attachment B (representative DPSF mailers).

42.     Even DPSF's web address, www.helppolice.org, furthers the perception that DPSF is a charity that helps police.

43.     In fact, although DPSF is organized as a non-profit, it is not operated as a legitimate charity whose primary purpose is to further a charitable mission. Instead, DPSF is the private fiefdom of Kenik. At Kenik's direction, the overwhelming majority of donations – $7.1 million out of $7.5 million or 94.52% from 2013 through 2016 – have gone to Kenik and the for profit telemarketers he hired. Any charitable benefit to DPSF's purported mission is incidental.

44.     DPSF's charitable façade is facilitated by the board of directors' complete failure to provide programmatic or financial oversight, or meaningfully supervise Kenik. Hand-picked and controlled by Kenik, the DPSF board is chaired by his wife, Jill Kenik. David Kenik manages every aspect of DPSF and its operation. He has authority over all DPSF finances and oversees all aspects of DPSF fundraising. He identifies telemarketers, signs fundraising contracts



and subcontracts, approves deceptive telemarketing scripts and other solicitation materials, and otherwise manages DPSF's relationship with its fundraisers. He is also solely responsible for operating DPSF's few "programs."

45.     The DPSF board does not operate like boards of legitimate charities that have regular meetings, keep minutes of their decisions at their meetings, and stay informed of their charities' operations. In 2015 and 2016, DPSF's board did not hold a single meeting. It conducted "business" when individual members responded to occasional emails sent by Kenik, who controls board communications. When contacted in October 2016, board member Krista Kurvers, who supposedly joined the board in 2014, stated that she had never attended a single DPSF board meeting and that she thought that

it had been more than nine months since she had been contacted to vote on anything. Board members were unaware of Kenik's actions and at least one person, Patricia Knudson, did not even know that DPSF considered her a director. Even officers of the DPSF board know little about the organization's operations. Don Selesky, who assumed the role of Secretary-Treasurer in April 2016, stated after several months in the position that he had not seen the books or financial records of DPSF and had taken no actions as Secretary.

46.     The DPSF board has been especially derelict in its oversight of Kenik. It does not review Kenik's performance, the hours he works, the vacation he takes, or the expenses he claims. Kenik was paid over $69,000 in 2015 for less than full-time work. His board-approved employment contract specifically allows Kenik to work part-time. In addition, Kenik's employment contract guarantees that for every year Kenik is not paid a salary of at least $100,000 the organization will pay the difference the following year or when funds become available. In approving such a contract, the DPSF board placed Kenik's interests over that of the charity, financially obligating the charity regardless of Kenik's performance or DPSF's financial health. In addition, the DPSF board does not prohibit Kenik from self-dealing. On at least two occasions, DPSF (at the direction of Kenik) purchased equipment it "donated" to law enforcement agencies directly from Kenik. DPSF has also made additional payments to Kenik in connection with production of training videos. Boards of legitimate charities oversee their executives' salaries, duties, and performance, and monitor self-dealing.

47. The DPSF board fails its fiduciary obligations in other ways. It does not review DPSF's operations, set mission-related program goals, or otherwise provide any meaningful oversight of DPSF's limited charitable spending. For example, for each of the three grant programs DPSF claims to conduct (on which it spent less than $25,000 of the more than $1.5 million donated in 2015), Kenik is solely responsible for reviewing and recommending grant recipients to the board. The board has no established policies or procedures for evaluating Kenik's recommendations. Rather, it simply approves his choices. The board also does not create and approve annual budgets or otherwise oversee DPSF's finances. The treasurer does not review – or even have access to – the organization's financial books and records. Boards of legitimate charities monitor program spending and efficacy, seek to ensure that the charities they oversee accomplish their charitable missions, and primarily benefit the charitable purposes they were founded to serve. The DPSF board did none of those things.

48. The DPSF board's routine approval of percentage-based fundraising contracts that pay fundraisers 88% - 90% of each donation further illustrates its failure to operate DPSF as a legitimate charity. Such contracts have provided DPSF's sole source of revenue from its inception. In addition to permitting the fundraisers to keep the vast majority of each dollar they solicit, the fundraising contracts allow DPSF's fundraisers to profit further by ceding to the fundraisers ownership and control over DPSF donor names. Because it is usually cheaper and easier to obtain contributions from past donors, typically fundraising expenses decline as organizations develop a database of loyal donors. By allowing fundraisers unfettered use of the donor lists, DPSF has never

benefitted from the reduced costs associated with soliciting past donors, and has continued to pay even long-term fundraisers the same high rates.

49.     For some charities, high fundraising costs can be attributed to start-up expenses or seeking support for unpopular causes. That is not the case here. DPSF has been in existence for years, and seeking support for disabled police officers is scarcely an unpopular cause. The DPSF board has simply not sought to negotiate more favorable contracts or pursued additional sources of revenue. At every turn, the DPSF board exists only to provide a false veneer of legitimacy to an organization that primarily benefits the private interests of Kenik and the fundraisers.

50.     Under these circumstances, DPSF has made false or misleading statements that deceived donors into believing their contributions would support a legitimate charity and be spent on real programs that fulfilled the charitable mission described to them.

### _Knowing Misrepresentations_

51.     Defendants knowingly misrepresented to donors that DPSF was a legitimate charity and that donations would be used to support specific charitable programs, including, e.g., helping disabled police officers and sheriffs. Defendants approved and authorized fundraisers' use of the scripts and mailers containing the misrepresentations described in Paragraphs 14 - 50 above. Kenik, who controls DPSF's finances, knew that less than a penny of any donation would be spent on most of the programs described to donors. In reality, and as Defendants knew, the overwhelming majority of the cash collected was used to benefit Kenik and the fundraisers; the so-called "charitable" programs described to donors provided little or no assistance to police or

sheriffs, disabled or otherwise. Under these circumstances, Defendants' knowingly engaged in deceptive solicitations and used charitable contributions contrary to the intent of donors.

### *Harm to Donors*

52.     Generous donors contributed more than $9 million to Disabled Police and Sheriffs Foundation from 2013 through 2017, believing that their money was going to help disabled officers and families of officers killed in the line of duty. In fact, the vast majority of contributed funds supported the private interests of for-profit telemarketers or inured to the personal benefit of David Kenik. Only an insignificant amount of money was actually spent on the programs described to donors. Under these circumstances, individual donors were deceived, and their charitable contributions wasted. In addition, donors had less money available to support the many legitimate charitable organizations operating real programs that help disabled officers and families of officers killed in the line of duty. Thus, donors' charitable intentions were frustrated and disabled officers and others actually in need of assistance were also harmed.

## DEFENDANTS' LAW VIOLATIONS

## SECTION 5 OF THE FTC ACT

53.     Section 5(a) of the FTC Act, 15 U.S.C. § 45(a), prohibits "unfair or deceptive acts or practices in or affecting commerce." Misrepresentations or deceptive omissions of material fact constitute deceptive acts or practices prohibited by Section 5(a) of the FTC Act.

<u>COUNT ONE</u>

**MISREPRESENTATIONS THAT CONTRIBUTIONS GO TO CHARITY**

**(by Plaintiff Federal Trade Commission)**

54.     Plaintiff FTC incorporates by reference Paragraphs 14 -52, above.

55.     In numerous instances, in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions will go to a legitimate charity whose primary purpose is to serve the public good by assisting disabled police or sheriffs or otherwise assisting law enforcement officers.

56.     In truth and in fact, in numerous instances donors' contributions have not gone to a legitimate charity whose primary purpose is to serve the public good by assisting disabled police or sheriffs or otherwise assisting law enforcement officers. Instead, the contributions have gone to a corporation whose operations demonstrate that it is not a legitimate charity and that its primary purpose is not to serve the public good by assisting disabled police or sheriffs or otherwise assisting law enforcement officers.

57.     Therefore, Defendants' representations as set forth in Paragraph 55 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT TWO

## MISREPRESENTATIONS THAT CONTRIBUTIONS WERE FOR

## SPECIFIED CHARITABLE PUPROSES

### (by Plaintiff Federal Trade Commission)

58.     Plaintiff FTC incorporates by reference Paragraphs 14 -52, above.

59.     In numerous instances in connection with soliciting charitable contributions from donors, Defendants have represented, directly or indirectly, expressly or by implication, that donors' contributions would be used to fund particular charitable programs. Such representations have included, but are not limited to, claims that contributions would be used to:

a.     Provide financial assistance to law enforcement officers disabled in the line of duty;

b.     Provide financial assistance to the families of officers killed in the line of duty;

c.     Provide law enforcement departments with safety equipment or grants to purchase safety equipment; or

d.     Provide advanced training programs for law enforcement departments and officers.

60.     In truth and in fact, in numerous instances little or none of the donors' contributions have been spent on the particular charitable programs described to them, specifically including programs to:

     a.     Provide financial assistance to law enforcement officers disabled in the line of duty;

     b.     Provide financial assistance to the families of officers killed in the line of duty;

     c.     Provide law enforcement departments with safety equipment or grants to purchase safety equipment; or

     d.     Provide advanced training programs for law enforcement departments and officers.

61.     Therefore, Defendants' representations as set forth in Paragraph 59 are false or misleading and constitute deceptive acts or practices in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT THREE

## MEANS AND INSTRUMENTALITIES OF DECEPTION

### (by Plaintiff Federal Trade Commission)

62.     Plaintiff FTC incorporates by reference Paragraphs 14 -52, above.

63.     In numerous instances, in connection with soliciting charitable contributions from donors, Defendants, individually or in concert with others, have provided fundraisers with the means and instrumentalities to deceive donors. The means and instrumentalities that Defendants have provided include, but are not limited to, approving for use by telemarketers scripts and other solicitation materials, such as brochures, donor invoices, and thank you letters, that make false or misleading claims about DPSF and its programs and are deceptive.

64.     By providing the means and instrumentalities to others for the commission of deceptive acts and practices set forth in Paragraph 63, Defendants have violated Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

### VIOLATIONS OF THE TELEMARKETING SALES RULE

65.     Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101 - 6108, in 1994. The FTC adopted the original Telemarketing Sales Rule in 1995, extensively amended it in 2003, and amended certain sections thereafter. 16 C.F.R. Part 310,

66.     The Telemarketing Act also authorizes attorneys general to initiate federal district court proceedings to enjoin telemarketing activities that violate the TSR, and in each such case, to obtain damages, restitution and other compensation on behalf of their residents. 15 U.S.C. § 6103(a).

67.     The TSR defines "charitable contribution" to mean "any donation or gift of money or any other thing of value." 16 C.F.R. § 310.2(h).

68.     The TSR defines "donor" to mean "any person solicited to make a charitable contribution." 16 C.F.R. § 310.2(p).

69.     The TSR defines "person" to mean "any individual, group, unincorporated association, limited or general partnership, corporation, or other business entity." 16 C.F.R. § 310.2(y).

70.     The TSR defines "telemarketer" to mean "any person who, in connection with telemarketing, initiates or receives telephone calls from a customer or donor." 16 C.F.R. § 310.2(ff).

71.     The TSR defines "telemarketing" to mean, in pertinent part, "a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one or more telephones and which involves more than one interstate telephone call." 16 C.F.R. § 310.2(gg).

72.     The TSR prohibits any person from providing substantial assistance or support to any seller or telemarketer when that person knows or consciously avoids knowing that the seller or telemarketer is engaged in any practice that violates Sections 310.3(a), (c), or (d) or 310.4 of the Rule. 16 C.F.R. § 310.3(b) the TSR.

73.     The TSR prohibits telemarketers from making a false or misleading statement to induce a charitable contribution. 16 C.F.R. Part 310.3(a)(4). The TSR also prohibits, inter alia, telemarketers from misrepresenting, directly or by implication, the nature, purpose, or mission of an entity on behalf of which a charitable contribution is being requested and the purpose for which any charitable contribution will be used. 16 C.F.R. § 310.3(d)(1) and (3).

74.     Pursuant to Section 3 (c) of the Telemarketing Act, 15 U.S.C. § 6102 (c), and Section 18(d)(3) of the FTC Act, 15 U.S.C. § 57a(d)(3), a violation of the TSR constitutes an unfair or deceptive act or practice in or affecting commerce, in violation of Section 5(a) of the FTC Act, 15 U.S.C. § 45(a).

## COUNT FOUR

## ASSISTING & FACILITATING TELEMARKETING VIOLATIONS

## (by Plaintiffs FTC and the State of Missouri)

75.     Plaintiffs incorporate by reference Paragraphs 14 -52, above.

76.     In numerous instances, in connection with soliciting charitable

contributions by telephone, Defendants have provided substantial assistance or support to

telemarketers while knowing or consciously avoiding knowing that the telemarketers

were engaged in acts or practices that violate Sections 310.3(a) (4) and 310.3(d)(1) and

(3) of the TSR, thereby violating Section 310.3(b) of the TSR. 16 C.F.R. § 310.3(b).

## THE MISSOURI MERCHANDISING PRACTICES ACT

77.     Section 407.020 of the Merchandising Practices Act provides in pertinent

part:

> The act, use or employment by any person of any deception, fraud,
> false pretense, false promise, misrepresentation, unfair practice or
> the concealment, suppression, or omission of any material fact in
> connection with the sale or advertisement of any merchandise in
> trade or commerce or the solicitation of any funds for any charitable
> purpose, as defined in section 407.453, in or from the state of
> Missouri, is declared to be an unlawful practice.… Any act, use or
> employment declared unlawful by this subsection violates this
> subsection whether committed before, during or after the sale,
> advertisement, or solicitation.

78.      "Person" is defined as "any natural person or his legal representative,

partnership, firm, for-profit or not-for-profit corporation, whether domestic or foreign,

company, foundation, trust, business entity or association, and any agent, employee,

salesman, partner, officer, director, member, stockholder, associate, trustee or cestui que trust thereof." § 407.010(5), RSMo.

79.     "Charitable organization" is defined as "any person … who does business in this state or holds property in this state for any charitable purpose and who engages in the activity of soliciting funds or donations for, or purported to be for, any fraternal, benevolent, social, educational, alumni, historical or other charitable purpose." § 407.453(1), RSMo.

80.     "Charitable purpose" is defined as "any purpose which promotes, or purports to promote, directly or indirectly, the well-being of the public at large or any number of persons, whether such well-being is in general or limited to certain activities, endeavors or projects." § 407.453(2), RSMo.

81.     "Solicitation" is defined as "any request or appeal, either oral or written, or any endeavor to obtain, seek or plead for funds, property, financial assistance or other thing of value, including the promise or grant of any money or property of any kind or value for a charitable purpose." § 407.453(6), RSMo.

## COUNT FIVE

### MISREPRESENTATIONS

### (by Plaintiff State of Missouri)

82.     Plaintiff State of Missouri incorporates by reference all the foregoing paragraphs.

83.     When soliciting charitable contributions, Defendants represented to donors, directly or indirectly, expressly or by implication, that DPSF is a legitimate charitable

organization and that it uses donations for charitable purposes and programs that serve the public good by assisting law enforcement officers.

84.     In truth and in fact, donors' contributions do not go to a legitimate charitable organization nor are the funds used for charitable purposes. Rather, the contributions go to for-profit fundraisers or to a corporation controlled by Defendant Kenik for his individual pecuniary gain.

85.     Defendants' representations described throughout this complaint violate § 407.020, RSMo, in that they are assertions not in accord with the facts.

## COUNT SIX

## FALSE PROMISES

### (by Plaintiff State of Missouri)

86.     Plaintiff State of Missouri incorporates by reference all the foregoing paragraphs.

87.     When soliciting charitable contributions, Defendants promised, whether directly or indirectly, expressly or by implication, that donors' contributions would be used to fund particular charitable programs. Such promises included, but are not limited to, claims that contributed funds would be used to:

     a.     Provide financial assistance to law enforcement officers disabled in the line of duty;

     b.     Provide financial assistance to the families of officers killed in the line of duty;

     c.     Provide law enforcement departments grants to purchase equipment;

and

       d.     Provide advanced training programs for law enforcement departments and officers.

88.     In truth and in fact, little or none of the donors' contributions funded the particular charitable purposes described to them, and donors' contributions were not meaningfully used for any charitable purpose.

89.     Defendants' promises described throughout this complaint were each false or misleading as to Defendants' intentions or ability to perform the promise or the likelihood the promise would be performed.

**COUNT SEVEN**

**DECEPTION**

**(by Plaintiff State of Missouri)**

90.     Plaintiff State of Missouri incorporates by reference all the foregoing paragraphs.

91.     In connection with soliciting charitable contributions from donors, directly or indirectly, expressly or by implication, Defendants engaged in deception in that they caused donors to believe that DPSF was a legitimate charitable organization that uses donations for charitable purposes and programs that serve the public good by assisting law enforcement officers.

92.     In connection with soliciting charitable contributions from donors, directly or indirectly, expressly or by implication, Defendants also engaged in deception in that they caused donors to believe that they would use more than a de minimis portion of their

contributions to provide financial assistance to law enforcement officers disabled in the line of duty, provide financial assistance to the families of officers killed in the line of duty, provide law enforcement departments grants to purchase safety equipment, or provide advanced training programs for law enforcement departments and officers.

93.     Defendants' methods, acts, uses, practices, or solicitations had a tendency or capacity to mislead, deceive or cheat, or tended to create a false impression.

## COUNT EIGHT

## UNFAIR PRACTICES

### (by Plaintiff State of Missouri)

94.     Plaintiff State of Missouri incorporates by reference all the foregoing paragraphs.

95.     Defendants violated § 407.020, RSMo, by engaging in unfair practices in connection with the solicitation of funds for a charitable purpose by failing to use or distribute the funds to the charitable purposes for which they were solicited. Such conduct offends public policy as it has been established by the Constitution, statutes or common law of this State.

96.     Defendants also violated § 407.020, RSMo, by engaging in unfair practices by using telemarking and charitable solicitation practices that violate federal law, specifically Section 5 of the FTC Act, 15 U.S.C. § 45(a) and Sections 16 C.F.R. 310.3(a) (4) and 310.3(d)(1), (3), and (4) of the TSR.

97.     Defendants' practices present a risk of, or have caused, substantial injury to consumers.

## CONSUMER INJURY

98.     Consumers have suffered and will continue to suffer substantial injury as a result of Defendants' violations of the FTC Act, the TSR, and the Missouri Merchandising Practices Act. In addition, Defendants have been unjustly enriched as a result of their unlawful acts or practices. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers, reap unjust enrichment, and harm the public interest.

## THIS COURT'S POWER TO GRANT RELIEF

99.     Section 13(b) of the FTC Act, 15 U.S.C. § 53(b), empowers this Court to grant injunctive and such other relief as the Court may deem appropriate to halt and redress violations of any provision of law enforced by the FTC. The Court, in the exercise of its equitable jurisdiction, may award ancillary relief, including rescission or reformation of contracts, restitution, the refund of monies paid, and the disgorgement of ill-gotten monies to prevent and remedy any violation of any provision of law enforced by the FTC.

100.    Section 19 of the FTC Act, 15 U.S.C. § 57b, and Section 6(b) of the Telemarketing Act, 15 U.S.C. § 6105(b), authorizes this Court to grant such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR, including the rescission or reformation of contracts and the refund of money.

101.    Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction to allow Plaintiff State of Missouri to enforce its state law claims against Defendants in this

Court for violations of the Missouri Merchandising Practices Act, Chapter 407, RSMo,

including injunctive relief, the rescission or reformation of contracts, restitution,

disgorgement of ill-gotten monies, attorneys' fees, costs, and such other relief to which

the State of Missouri may be entitled.

### PRAYER FOR RELIEF

Wherefore, Plaintiffs FTC and the State of Missouri, pursuant to Sections 13(b)

and 19 of the FTC Act, 15 U.S.C. §§ 53(b) and 57b, the TSR, 16 C.F.R. Part 310,

Sections 407.100 – 407.140, RSMo, and the Court's own equitable powers, request that

the Court:

A.      Enter a permanent injunction to prevent future violations of the FTC Act,

the TSR, and the MMPA by Defendants;

B.      Award such relief as the Court finds necessary to redress injury to

consumers resulting from Defendants' violations of the FTC Act and the TSR, including

but not limited to, rescission or reformation of contracts, restitution, the refund of monies

paid, and the disgorgement of ill-gotten monies;

C.      Require Defendants, pursuant to § 407.100, RSMo, to pay as restitution and

to disgorge all amounts Defendants received through the use of any of the unlawful,

unfair, or deceptive acts and practices alleged herein and order all funds received from

Defendants to be directed under the doctrine of *cy pres* to legitimate charities that assist

disabled law enforcement personnel injured in the line of duty and the families of law

enforcement personnel killed in the line of duty;

D.       Require Defendants, pursuant to § 407.140.3, RSMo, to pay to the State of Missouri an amount of money equal to ten percent of the total restitution ordered against Defendants;

E.       Require Defendants to pay all court, investigative, and prosecution costs of this case pursuant to § 407.130, RSMo and the FTC Act; and

F.       Grant any additional relief that the Court may determine to be just and proper.

Respectfully submitted,


Dated:  March 27, 2019


ALDEN F. ABBOTT                    ERIC SCHMITT
General Counsel                         Attorney General
CHARLES A. HARWOOD
Regional Director, Northwest Region



/s/ Tracy S. Thorleifson              /s/ Michelle Hinkl
Tracy S. Thorleifson, 16623WA        Michelle Hinkl, #64494MO
Attorney                                   Assistant Attorney General
Federal Trade Commission,           Missouri Attorney General's Office
Northwest Region                        P.O. Box 861
915 Second Ave., Suite 2896         St. Louis, MO 63188
Seattle, WA 98174                       (314) 340-7961
(206) 220-4481                           michelle.hinkl@ago.mo.gov
tthorleifson@ftc.gov
                                               ATTORNEY FOR PLAINTIFF STATE OF
ATTORNEY FOR PLAINTIFF           MISSOURI
FEDERAL TRADE COMMISSION